UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARYUM AUTUMN TAHIRKHELI,

    Plaintiff, v.

ASCENSION VIA CHRISTI HOSPITAL
PITTSBURG, INC., SOUND PHYSICIANS
EMERGENCY MEDICINE OF KANSAS, LLC,
and KATHRYN M. CORNELIUS, M.D.,

    Defendants.

Case No. 24-2426-EFM-BGS

## MEMORANDUM & ORDER

NOW BEFORE THE COURT is Plaintiff's Motion to Compel Defendant Ascension Via Christi Hospital Pittsburg, LLC ("Defendant Ascension" or "Defendant") to produce documents Plaintiff alleges are relevant to her EMTALA claim. (Doc. 149.) For the reasons set forth herein, Plaintiff's motion is **GRANTED in part** and **DENIED in part** as set forth herein.

## GENERAL FACTUAL BACKGROUND

Plaintiff alleges violations of the Emergency Medical Treatment and Labor Act, 42 U.S.C.A. § 1395dd ("EMTALA") (Count I), violations of the Kansas Consumer Protection Act (Count II), and intentional infliction of emotional distress (Count III) as a result of a May 24, 2024, ER visit for Plaintiff's minor daughter ("the minor child").[1] Plaintiff alleges that Defendant Ascension violated EMTALA by failing to: (1) determine whether the minor child was suffering from an emergency medical condition, (2) obtain informed consent from Plaintiff as to the minor child's treatment, (3) involve Plaintiff in the treatment plan for the minor child, and (4) violating the privacy and safety of

---

[1] These three claims remain pending against Defendant Ascension. Only Count III for intentional infliction of emotional distress remains pending against Defendants Sound Physicians and Cornelius. (See Doc. 36).

1

Plaintiff and her minor child.  (*See generally* Doc. 1.)  More specific factual allegations are summarized in the District Court's Memorandum & Order on Defendants' Motion to Dismiss (Doc. 36, at 1-3).  That summary is incorporated by reference.  Defendants generally deny Plaintiff's allegations.

## PLAINTIFF'S MOTION TO COMPEL

In her motion, Plaintiff seeks an Order compelling production of Defendant Ascension's Medicaid contract with the government, which Plaintiff contends would establish Defendant "is required to implement federal regulations regarding patient care into its policy, including a mechanism to enforce those policies."  (Doc. 149, at 1.)  Plaintiff also seeks Defendant Ascension's bylaws "to see the mechanism [it] used … to enforce its policies regarding patient care."  (*Id.*)  Finally, Plaintiff seeks production of Defendant Ascension's policies, including the "Downtime Policy," that was "repeatedly mentioned by Dr. Cornelius in her depositions."  (*Id.*, at 1-2.)  Plaintiff argues that this information is central to her claims as well as Defendant's defenses.  (*Id.*, at 2.)

Plaintiff contends that during the parties' meet & confer telephone conference, Defendant Ascension's attorney stated that only a table of contents for the Medical Staff Bylaws from the requested documents would be provided, but that the parties could then "discuss exactly what the Plaintiff believes is relevant to the case, and [Defendant] would then decide if it would produce those Bylaws, but then [Defendant's] counsel only provided a redacted document with two partially readable pages, not a complete table of contents, making the phone discussion meaningless."  (*Id.*, at 3 (referencing Doc. 151).)  Defendant generally argues that the documents sought by Plaintiff are irrelevant to the claims and defenses in this case.  (Doc. 157, at 2.)

## ANALYSIS

### I.     Legal Standards for Motions to Compel Discovery.

The scope of discovery is governed by Federal Rule of Civil Procedure 26, which states in relevant part that

2

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at state in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b).

To be discoverable, the information sought must be nonprivileged, relevant, and proportional to the needs of the case. *Holick v. Burkhart*, No. 16-1188-JTM-KGG, 2018 WL 372440, at *2 (D. Kan. Jan. 11, 2018). Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). *See also Beaty v. Kansas Athletics, Inc.*, No. CV 19-2137-KHV, 2020 WL 1862563, at *2 (D. Kan. Apr. 14, 2020) (citations omitted).

Pursuant to Fed. R. Civ. P. 37, a party may move the Court for an order compelling answers to interrogatories and requests for production of documents. The documents sought through discovery need not be admissible to be discoverable. Federal Rule of Civil Procedure 26(b)(1). If the discovery sought appears relevant, the party resisting discovery has the burden to establish the lack of relevancy by demonstrating that the requested discovery (1) does not come within the scope of relevancy as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevancy that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure. *Brecek & Young Advisors, Inc. v. Lloyds of London Syndicate 2003*, No. 09-2516-JAR, 2011 WL 765882, at *3 (D. Kan. Feb. 25, 2011). *See Swackhammer v. Sprint Corp. PCS*, 225 F.R.D. 658, 661, 662, 666 (D. Kan. 2004) (stating that the party resisting a discovery request based on overbreadth, vagueness, ambiguity, or undue burden/expense objections bears the burden to support the objections). Conversely, when the relevancy of the discovery request is not readily apparent on its face, the party seeking the discovery has the burden to show the relevancy of the request. *Id.* Relevancy determinations are generally made

3

on a case-by-case basis. *Id.*

## II. Documents Requested by Plaintiff.

By way of general context, Plaintiff argues that "EMTALA cases fundamentally turn on whether a hospital followed its own policies and procedures." (Doc. 149, at 4.) For instance, in *Phillips v. Hillcrest Medical Center*, the Tenth Circuit held that whether a hospital has performed an appropriate medical screening examination depends on whether the hospital adhered to its own policies and procedures. 244 F.3d 790, 796-97 (10th Cir. 2001).

Plaintiff continues that it is improper to allow Defendant Ascension to

> claim it complied with EMTALA while simultaneously refusing to produce the policies by which such compliance must be measured. [Defendant's] EMTALA policy itself references "local Hospital policy" when referring to Medical Screening Exam (MSE) and leaving Against Medical Advice (AMA). ([Doc. 152, at 2, 5]). Without these policies and procedures, it is impossible for the Plaintiff to demonstrate whether [Defendant] adhered to its own standard procedures as required by law.
>
> The underlying principle behind section 1395dd(a) is to ensure all patients, regardless of their perceived ability or inability to pay, are given consistent attention. EMTALA's requirement of an appropriate screening examination, stabilizing treatment, and appropriate transfer require a hospital to apply uniform procedures and policies to all individuals coming to the emergency room. A hospital's failure to abide by its established policies shows disparate treatment.

(Doc. 149, at 4-5.)

It is true that EMTALA liability attaches "[u]nless each patient, regardless of perceived ability or inability to pay, is treated in a uniform manner" in accordance with the hospital's existing policies and procedures. *Phillips*, 244 F.3d at 797 (citing *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir.1994)). Further, EMTALA § 395dd(a) imposes a strict liability standard. *Id.*, at 798 (citing *Stevison v. Enid Health Sys's*, 920 F.2d 710, 713 (10th Cir.1990) and *Roberts v. Galen of Virginia*, 525 U.S. 249, 252, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999)). Within this context, the Court will analyze the discoverability of the documents at issue.

4

### A.     Medicaid Contract (Request for Production No. 1).

Plaintiff's Request No. 1 asks for the "[c]ontract between Ascension Via Christi Hospital Pittsburg, Inc. (Ascension) and Medicaid (MCD) KanCare United Healthcare," which will hereinafter be referred to as the "Medicaid contract." (Doc. 150, at 1.) Defendant objected that the request is irrelevant and beyond the scope of discovery as it "has no importance in resolving the issues of the case." (*Id.*) Defendant continues that the "burden or harm to [it] of producing the contract also outweighs its nonexistent benefit because the contract contains negotiated terms the parties to the contract consider sensitive and confidential." (*Id.*)

Plaintiff seeks an Order compelling the contract because the document apparently would establish that Defendant Ascension "is required to implement federal regulations regarding patient care into its policy, including a mechanism to enforce those policies." (Doc. 149, at 1.) According to Plaintiff, this document "requires hospitals to follow federal regulations, which would entail policies to enforce those regulations, and consequences for violations," making it "crucial for demonstrating whether [Defendant Ascension] met its obligations under federal regulations governing Medicaid participating hospitals and patient rights pursuant to 42 C.F.R. § 482.13." (*Id.*, at 5-6.)

Defendant Ascencion acknowledges that it accepts Medicaid dollars from the federal government, thus making it bound to EMTALA and other federal laws that accompany the money. (Doc. 157, at 7.) Defendant also admits that Plaintiff's daughter's medical services were paid for by Medicaid, that it has an EMTALA policy, and that it is an EMTALA-participating hospital pursuant to 42 U.S.C. § 1395dd with a provider agreement pursuant to 42 U.S.C. § 1395cc (which is the Medicaid Contract at issue). (*Id.*)

While Defendant admits EMTALA is applicable, it states the following defenses:

> (1) that Plaintiff has not actually stated an EMTALA claim through her factual allegations; (2) that Plaintiff lacks standing to pursue an EMTALA claim when it was her daughter who was the patient; and (3) that the Hospital complied with EMTALA when it treated Plaintiff's daughter.

(*Id.* (citing Doc. 109, Defendant's Summary Judgment brief, at 10-17).) In other words, Defendant "would not take the position it complied with EMTALA if EMTALA did not apply to it in the first place." (*Id.*, at 8.) Thus, according to Defendant, its Medicaid Contract is unnecessary for Plaintiff to prove Defendant must comply with EMTALA, making the contract itself have "no importance in resolving the issues of the case." (*Id.*)

By admitting the application of EMTALA, Defendant Ascension conversely and tacitly admits the facial relevance of the contract. Even though the applicability of EMTALA is not in dispute, this does not mean that Plaintiff must simply forego exploring what specific requirements are imposed on Defendant by the contract.

Defendant also argues that the terms of the Medicaid contract constitute "sensitive business information that both parties [to the contract] hold confidential" and that disclosure would cause them harm. (Doc. 157, at 8.) It is well-settled in this District that

> confidentiality does not act as a bar to discovery and is not grounds to withhold documents or information from discovery. 'A concern for protecting confidentiality does not equate to privilege.' While a confidentiality objection may be appropriate when a party seeks a protective order limiting the parties' use or disclosure of confidential information, it is generally not a valid objection to withholding discovery altogether.

*High Point SARL v. Sprint Nextel Corp.*, No. 09-2269-CM-DJW, 2011 WL 4008009, at *1 (D. Kan. Sept. 9, 2011) (citations and footnotes omitted). *See also Kendall State Bank v. West Point Underwriters, LLC*, No. 10-2319-JTM-KGG, 2013 WL 593957, at *2 (D. Kan. Feb. 15, 2013) (holding that " 'privileged' and 'confidential' are two distinct concepts.") The Court finds the contract to be relevant and that any confidentiality concerns can be remedied by the Protective Order in effect in this case (Doc. 55). These objections from Defendant Ascension are **overruled** and this portion of Plaintiff's motion is **GRANTED**.

    **B.**    **Medical Staff Bylaws, Rules and Regulations, and Appointment Policy[2] (Request for Production No. 2).**

Plaintiff's Request No. 2 asks for Defendant's "Medical Staff Bylaws, Rules and Regulations, and Appointment Policy" in effect on the date in question. (Doc. 150, at 1.) Defendant objected that the bylaws, rules and regulations "in their entirety" are irrelevant and overly broad. (*Id.*)

Plaintiff argues that these documents are "essential to understanding the incorporation of the federal rules into [Defendant's] rules, thereby effecting [Defendant's] policies." (Doc. 149, at 6.) Plaintiff continues that the documents

> define which medical personnel are qualified to conduct medical screening examinations under EMTALA. [Defendant's] EMTALA policy specifically references 'individuals defined by the medical staff's bylaws, rules, and regulations or other document approved by [Defendant's] governing body to perform the medical screening examinations.' ([Doc. 152, at 2].) [Defendant's] Emergency Medical Service Agreement with Sound Physicians requires that '[it] will make available copies of the bylaws, rules and regulations, policies and/or procedures of the Medical Staff and governing board relevant to Contractor's and Physicians' performance of services under this Agreement.' ([Doc. 153, at 10.])

(*Id.*) Thus, according to Plaintiff, the documents "directly govern how EMTALA policies are conducted in the Hospital and are essential to determining compliance." (*Id.*) Plaintiff continues that the local policy, if one exists, "would be important for issues of specific conduct" because Defendant Ascension's "generic" EMTALA policy is "full of great concepts as 'respect for human dignity,' " thus failing "to show how these concepts are implemented through the Hospital policy." (*Id.* (citing Doc. 152, at 9.)

Defendant Ascension argues that an EMTALA violation case is different and distinct from a medical malpractice case and Plaintiff is conflating the two. (Doc. 157, at 3-4.) Defendant asserts that the motion to compel demonstrates Plaintiff's "misunderstanding of the EMTALA issue in the case"

---

[2] Plaintiff states that her Second Requests for Production "mistakenly referred to the Hospital Policy as 'Appointment' Policy," but that this mistake was clarified during the parties' Rule 37.2 meet & confer telephone conference. (Doc. 149, at 2.) Plaintiff's motion and reply make no further reference to requesting an "Appointment" policy.

7

because an EMTALA claim "does not open the door to every hospital policy and procedure for a review of whether the hospital complied." (*Id.*, at 3.)  EMTALA requires

> a hospital to create standard emergency room screening procedures based upon the hospital's particular needs and circumstances. EMTALA imposes strict liability upon a hospital that creates screening procedures but fails to apply the essential elements of those procedures. In resolving a claim of failure to screen under EMTALA, a court should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed.

*Tank v. Chronister*, 941 F.Supp. 969, 972 (D. Kan. 1996). Thus, Defendant argues it should be judged on whether it has an EMTALA policy and whether it was followed. (Doc. 157, at 3-4.) Defendant notes that it has produced its EMTALA policy to Plaintiff. (*Id.*, at n.2 (citing Doc. 152).)

According to Defendant, the remaining bylaws, rules and regulations requested by Plaintiff are "very broad and cover a wide array of topics, ranging from various administrative procedures like medical staff discipline and appeals – to specific requirements for obtaining written consent to conduct an autopsy." (*Id.*, at 4.) Because this is not a medical malpractice or negligence case, the Court agrees with Defendant that "[t]here is no relevance in Plaintiff fishing through every Hospital patient care policy to see whether or not Plaintiff's daughter's care providers complied with the policy." (*Id.*)

Plaintiff replies that Defendant has admitted that bylaws are "used to discipline the staff," so they "should reveal enforcement mechanisms for EMTALA compliance." (Doc. 160, at 2 (citing Doc. 157, at 4, n.4.) This does not mean, however, that each and every bylaw – which is what Plaintiff has requested – relates to this, or any other relevant, issue in this case. By seeking each and every hospital bylaw, rule, and regulation, Plaintiff's Request No. 2 is facially overbroad and seeks information that is both irrelevant and disproportionate to the needs of the case. This portion of Plaintiff's motion is, therefore, **DENIED**.

### C. Downtime Policy and Disaster Policy (Request for Production No. 3).

At the time of the subject treatment to Plaintiff's daughter, Defendant Ascension was

undergoing a systemwide cyberattack rendering its electronic medical record system unavailable. (See Doc. 157, at 5.) As a result, certain medical records in this case are handwritten rather than created in electronic format.

In this context, Plaintiff's Request No. 3 asks for Defendant's "Downtime Policy, and Disaster Policy" in effect on the date in question. (Doc. 150, at 2.) Defendant objected that the phrases "Downtime Policy" and "Disaster Policy" are vague and ambiguous. Defendant continued that

> [t]o the extent Plaintiff seeks Ascension's plans or policies related to large-scale emergencies – like natural or human-caused disasters – such plans or policies would not be relevant to this case. To the extent Plaintiff seeks Ascension's plans for managing IT system outages, Plaintiff's 'Downtime Policy' request is overbroad and encompasses a significant amount of material that has nothing to do with this case.

(*Id.*)

Plaintiff describes production of these policies as "crucial" because it is "important to know what steps are taken to protect the patients when the hospital systems are down, and whether proper protocols were followed." (Doc. 149, at 7.) She describes hospital policy and training as "integral" to Defendant's compliance obligations under EMTALA.[3] (*Id.*)

Plaintiff argues that Defendant "refuses to provide these documents" even though "[t]hroughout the documents provided by the Defendant – the Emergency Medicine Service Agreement and the EMTALA policy – there are repeated references to 'local Hospital policy,' federal rules, and state regulations that physicians are required to follow." (Doc. 149, at 7 (citing Doc. 152).) Plaintiff points to Defendant's Emergency Medical Service Agreement with Sound Physicians, which requires doctors to "comply with the requirements set forth in the bylaws, rules and regulations, policies and/or procedures of the Medical Staff and Hospital's governing board." (*Id.* (citing Doc. 153, at 2).) Plaintiff also discusses various passages from the deposition of Defendant Dr. Cornelius in

---

[3] When shown a certain medical record during her deposition, Defendant Dr. Cornelius testified "That is one of our downtime order sheets." (Doc. 154, at 24.)

9

which she testified that she received no training from Defendant Ascension.[4]  (*Id.*, at 8 (citing Doc. 154, at 13, and 94.)  According to Plaintiff, Defendant's "refusal to produce the policy and related documents while simultaneously claiming it complied with its policies is absurd."  (*Id.*)

        **1.**      **Disaster Policy.**

Defendant describes its "Disaster Policy" as encompassing "a variety of internal plans and protocols, covering what to do across a range of potential mass casualty events, in circumstances both where the event directly impacts the Hospital or is outside the Hospital."  (Doc. 157, at 6.)  Defendant asserts that the plans are "highly sensitive, treated by the Hospital as confidential, and have nothing to do with this case."  (*Id.*)  As stated previously, however, confidentiality does not necessarily prohibit discovery.  *High Point SARL*, 2011 WL 4008009, at *1 (holding that "confidentiality does not act as a bar to discovery and is not grounds to withhold documents or information from discovery.").

That stated, the Court finds that the relevance of the "Disaster Policy" – which relates to mass casualty events – is not facially apparent to the facts of this case.  As such, it is Plaintiff's burden as the party seeking discovery to show its relevance.  *Design Basics, LLC v. Strawn*, 271 F.R.D. 513, 523 (D. Kan. 2010) (citation omitted) (holding "when the relevancy of the requested discovery is not readily apparent, the party seeking the discovery has the burden to show the relevancy of the request.").

In this regard, the only specific reference to the "Disaster Policy" in Plaintiff's motion or reply brief is the following:  "**The Downtime Policy and Disaster Policy** are crucial because Dr. Cornelius testified about downtime procedures during her deposition … ."  (Doc. 149, at 7 (emphasis in original).)  Plaintiff then states that "[t]hese policies are important to know what steps are taken to protect the patients when the hospital systems are down, and whether proper protocols were followed."  (*Id.*)  This argument clearly relates more, if not only, to the Downtime Policy, discussed

---

[4] Plaintiff also asserts there was additional relevant testimony during Dr. Cornelius's second deposition, but that the transcript was not yet available when the present motion was filed.  Plaintiff offered to provide the transcript upon receipt, but the Court finds further deposition citations unnecessary to its analysis.

*infra*, rather than the Disaster Policy.  As such, Plaintiff has failed to meet her burden to establish the relevancy of the Disaster Policy and this portion of her motion is **DENIED**.

### 2.  Downtime Policy.

Defendant admits the "Downtime Policy" is "closer to what [Plaintiff] ostensibly seeks because it contains the protocol for how to handle an unplanned outage of the Hospital's electronic system," which is what occurred on the day in question.  (Doc. 157, at 6.)  Even so, Defendant argues this policy is "still irrelevant" and "has no bearing on Plaintiff's claims in this case."  (*Id.*)

This description of the "Downtime Policy" by Defendant, however, establishes that it is facially relevant to the facts of this case.  As discussed above,

> [r]elevancy is broadly construed during the discovery phase, and a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party.  When the discovery sought appears **relevant on its face, the party resisting the discovery has the burden to establish that the requested discovery does not come within the scope of relevance** as defined under Rule 26(b)(1), or is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.

*Design Basics, LLC*, 271 F.R.D. at 523 (emphasis added) (citations omitted).  Defendant's unsupported assertion that the policy is "still irrelevant" does not meet this burden to overcome the facial relevance of the policy.  As such, Plaintiff's request to compel the "Downtime Policy" is **GRANTED**.

IT IS THEREFORE ORDERED that Plaintiff's Motion to Compel (Doc. 149) is **GRANTED in part** and **DENIED in part** as more fully set forth herein.  Defendant shall submit the documents ordered to be produced **on or before February 4, 2026**.

IT IS SO ORDERED.

Dated January 28, 2026, at Wichita, Kansas.

/s/ Brooks G. Severson  
Brooks G. Severson  
U.S. Magistrate Judge

11