**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

MARYUM AUTUMN TAHIRKHELI,

    *Plaintiff*,

v.

                                      Case No. 24-2426-EFM

ASCENSION VIA CHRISTI HOSPITAL
PITTSBURG, INC., et al.,

    *Defendants*.

**MEMORANDUM AND ORDER**

On May 23, 2024, Plaintiff Maryum Tahirkheli took her daughter, A.A., to the emergency room. Based on the facts surrounding this hospital visit, Plaintiff brings a claim for intentional infliction of emotional distress ("IIED") against Defendants Ascension Via Christi Hospital Pittsburg, Inc. ("Ascension"), Dr. Kathryn M. Cornelius, M.D., and Sound Physicians Emergency Medicine of Kansas, LLC ("Sound Physicians"). Plaintiff also brings claims under the Emergency Medical Treatment and Labor Act ("EMTALA")[1] and the Kansas Consumer Protection Act ("KCPA")[2] against Ascension.

Before the Court are three motions for summary judgment. Ascension brings the first Motion for Summary Judgment (Doc. 108) on all three of Plaintiff's claims against it. Dr. Cornelius and Sound Physicians bring the second Motion for Summary Judgment (Doc. 172) on Plaintiff's IIED claim against them. Plaintiff brings the third Motion for Summary Judgment (Doc. 178) in which she asks for summary judgment in her favor on her EMTALA claim against

---

[1] 42 U.S.C. § 1395dd.

[2] K.S.A. 50-623 *et seq.*

Ascension and asks the Court to "[e]nter a Summary Judgement that Dr. Cornelius altered the medical records[.]"[3] In the alternative, Plaintiff asks the Court to enter an order pursuant to Federal Rule of Civil Procedure 56(g) specifying the uncontroverted material facts as conclusively proven for trial. This case, however, will not reach trial. For the reasons explained below, the Court grants summary judgment to Ascension on Plaintiff's EMTALA claim, denies Plaintiff's summary judgment motion, and declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.[4]

## I.    Factual and Procedural Background

### A.    Plaintiff's Non-Compliance with D. Kan. Rule 56.1

Before setting out the uncontroverted material facts in this case, the Court addresses the reason underlying its difficulty in doing so. The rules for summary judgment motions in the District of Kansas are set forth in D. Kan. Rule 56.1. Under that rule, "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."[5] D. Kan. Rule 56.1(b) addresses opposing motions for summary judgment:

---

[3] Doc. 178 at 22.

[4] Because the Court's Order closes this case, the Court also denies the parties' *Daubert* motions (Docs. 170 & 176) as moot.

[5] D. Kan. Rule 56.1(a).

(1) A brief in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed.

(2) If the party opposing summary judgment relies on any facts not contained in movant's brief, that party must set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above. All material facts set forth in this statement of the non-moving party will be deemed admitted for the purpose of summary judgment unless specifically controverted by the reply of the moving party.

Plaintiff largely failed to comply with Rule 56.1 in her briefing. First, Plaintiff did not comply with Rule 56.1 when responding to Ascension's motion filed before the close of discovery. There, Plaintiff does not identify which portions of Ascension's Statement of Fact ("SOF") she intends to controvert, nor does she cite to portions of the record for which she relies upon to do so. She simply provides her own statement of material facts. The Court recognizes that Plaintiff argued Ascension was withholding certain discovery at the time, but that does not excuse her failure to cite to portions of the record already established.

Similarly, Plaintiff did not comply with Rule 56.1 when replying to Dr. Cornelius and Sound Physicians' response to Plaintiff's partial summary judgment motion, which was filed after the close of discovery. There, Plaintiff also does not identify which portions of Dr. Cornelius and Sound Physician's additional SOFs she intends to controvert, nor does she cite to portions of the record for which she relies upon to do so.

In addition, Plaintiff's attempts to comply with Rule 56.1 largely fall short of its requirements. In responding to Dr. Corneluis and Sound Physicians' motion, Plaintiff wholly fails to cite to portions of the record to controvert several SOFs. Where Plaintiff cited to portions of the

record, several citations do not actually controvert the SOFs. Plaintiff also did not provide any additional SOFs for the Court's consideration in deciding Dr. Corneluis and Sounds Physicians' motion. Plaintiff's reply to the additional SOFs in Ascension's response to Plaintiff's motion suffers similar deficiencies.

The deficiencies in Plaintiff's briefing significantly complicate the Court's already complicated review of the SOFs in the parties' briefing across three summary judgment motions. Nonetheless, the Court has gone beyond Plaintiff's deficiencies in an attempt to properly set forth the uncontroverted, material facts and to determine whether genuine issues of material fact exist.[6] Accordingly, the following material facts are uncontroverted or deemed admitted. The facts, where controverted, are noted as such.

**B.    Background**

In the late hours of May 23, 2024, Plaintiff woke up to her three-year-old daughter, A.A., screaming and subsequently brought her to the emergency room at Ascension in Pittsburg, Kansas. Dr. Cornelius was working at Ascension that evening. Dr. Cornelius has worked as an emergency medicine physician for over twenty years. At the time of this case, she was licensed to provide care in the state of Kansas and was employed by Sound Physicians, an independent contractor that provides emergency medicine physicians such as Dr. Cornelius to Ascension. Dr. Cornelius conducted a medical screening examination ("MSE") of A.A.

---

[6] "Even if a non-movant does not respond at all, the Court must determine whether the movant is entitled to summary judgment on the merits." *Prince v. Kan. City Tree Care, LLC*, 660 F. Supp. 3d 1082, 1090 n.6 (D. Kan. 2023) (citing Fed. R. Civ. P. 56(e)(3)).

A.A. was very irritable before and during the MSE; neither Plaintiff nor Dr. Cornelius were able to have a verbal exchange with A.A. aside from her screaming. Emergency room staff asked Plaintiff if A.A. could have ingested anything. The parties dispute how cooperative Plaintiff was with emergency room staff. At some point, however, Plaintiff informed emergency room staff that A.A. may have ingested the other half of a "sleep gummy" she took earlier that evening and retrieved packaging of one of these sleep gummies from her car. Plaintiff reported she purchased the sleep gummy A.A. possibly ingested in Kansas. The packaging read "100mg THC and 5mg CBD."[7] Plaintiff never found the other half of the sleep gummy she consumed that evening. Based on Plaintiff's statements and the MSE, Dr. Cornelius ordered urine and blood lab testing of A.A. In A.A.'s medical records, Dr. Cornelius noted:

> Labs pending at this time. Concerned that mother was not forthright with history, specifically denied any possibility of ingestion to triaging nurse and then told me she could have eated "1/2" of a "sleeping medication." Dispo pending lab results, monitoring and discussion with pediatrician. Will make DFS report.[8]

---

[7] Plaintiff attempts to dispute that the sleep gummy contained "100mg THC" because a law enforcement officer investigating the case later purchased the same sleep gummy from a Pittsburg store and could not have legally done so if it contained "100mg THC." But Plaintiff fails to controvert that the packaging read "100mg THC and 5mg CBD," which is confirmed by the same officer's narrative that Plaintiff relies on in her attempt to dispute the sleep gummy's contents. *See* Doc. 223.

[8] Plaintiff disputes Dr. Cornelius's characterization that she was not forthright with A.A.'s prior history.

Ascension was experiencing a cybersecurity event during A.A.'s emergency room visit.[9] Because of this, staff did not have access to electronic medical records, resulting in handwritten medical records including A.A.'s urine test results. The handwritten records for A.A.'s MSE show A.A.'s urine was collected at 1:12 A.M. on May 24, 2024, and tested positive for tetrahydrocannabinol ("THC") at 1:25 A.M. An electronic record shows A.A.'s urine tested positive for THC, but at 12:05 A.M. instead. Defendants attribute the timing discrepancy as a clerical error due to the cybersecurity event. Plaintiff argues this discrepancy establishes that Dr. Cornelius systematically altered A.A.'s medical records after what came next.

Dr. Cornelius informed Plaintiff she wanted to admit A.A. to the hospital for observation, but Plaintiff decided to leave the hospital with A.A. against medical advice. As she was leaving, Dr. Cornelius informed Plaintiff that A.A.'s urine tested positive for THC. Plaintiff testified that she did not believe Dr. Cornelius because she had not been shown the test result itself, despite asking staff to see it, and that she did not trust Dr. Cornelius to care for her daughter. The parties dispute whether Dr. Cornelius further advised Plaintiff on the risks of THC intoxication like Dr.

---

[9] Defendants offer an affidavit by Matt Wittenberg, Ascension's Director of Compliance Technology and Innovation, to discuss the cybersecurity event and its impact on generating electronic records for A.A.'s emergency room visit. Docs. 247-11 & 253-1. Plaintiff objects to Ascension's use, but not Dr. Cornelius and Sound Physicians' use, of this affidavit under Federal Rule of Civil Procedure 37(c)(1) because Mr. Wittenberg was not identified as a witness during discovery. *See* Doc. 270 at 2. Rule 37(c)(1) provides "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . ." Thus, the Court will not consider the statements in Mr. Wittenberg's affidavit.

Plaintiff, however, failed to controvert SOF 23 in Dr. Cornelius and Sound Physicians' motion citing to other evidence to establish that "[f]or multiple weeks, including at the time of A.A.'s care, the hospital staff and providers did not have access to the Electronic Medical Record ("EMR") due to a cybersecurity event, resulting in certain medical records being handwritten during this time, including the subject lab report." Doc. 172 at 5, ¶ 23. Thus, this fact is uncontroverted and deemed admitted.

Cornelius's notes in A.A.'s medical records state. Shortly after this conversation, Plaintiff left the emergency room with A.A.

At approximately 3:39 A.M., Pittsburg Police Department officers were dispatched to Ascension. Dr. Cornelius informed them that A.A. had marijuana in her system and that Plaintiff had left the hospital with her. Dr. Cornelius, a mandated reporter, also informed the officers that she reported the incident to the Kansas Department for Children and Families, or "DFS" as Dr. Cornelius refers to it. Officers located Plaintiff and A.A., returned A.A. to Ascension, and arrested Plaintiff for child endangerment and held in jail without bond for two days. Plaintiff reports she has since lost custody of A.A., her employment as a certified nursing assistant, and her nursing certificate. Plaintiff was not criminally prosecuted.

Now, Plaintiff brings two lawsuits based on the events occurring during and after she brought A.A. to the emergency room. In this suit, Plaintiff  originally alleged violations of EMTALA (Count I), violations of the KCPA (Count II), and IIED (Count III) against Ascension, Dr. Cornelius, and Sound Physicians.[10] The Court previously granted Dr. Cornelius and Sound Physicians' motion to dismiss Counts I and II as brought against them.[11] The parties' pending summary judgment motions are fully briefed.

---

[10] Plaintiff's other case, Case No. 24-2482-TC-JBW, is a 42 U.S.C. § 1983 suit against the City of Pittsburg, various law enforcement officers, and city officials.

[11] *Tahirkheli v. Ascension Via Christi, Hosp. Pittsburg, Inc.*, 2025 WL 522451, at *4 (D. Kan. Feb. 18, 2025); Doc. 36.

## II.      Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[12] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[13] The movant bears the initial burden of proof to show the lack of evidence on an essential element of the claim.[14] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[15] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[16] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[17]

This same standard applies to cross-motions for summary judgment.[18] Each party bears the burden of establishing that no genuine issue of material fact exists and entitlement to judgment as a matter of law.[19] "Cross-motions for summary judgment are to be treated separately; the denial of

---

[12] Fed. R. Civ. P. 56(a).

[13] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[14] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[15] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[16] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[17] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[18] *R.C. by S.P. v. J.C.*, 736 F. Supp. 3d 1050, 1057 (D. Kan. 2024).

[19] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

one does not require the grant of another."[20] But where the cross-motions overlap, the Court may permissibly address the legal arguments together.[21] The Court views each motion in the light most favorable to its nonmoving party.[22]

### III.    Analysis

**A.    Count I: Plaintiff's EMTALA Claim Against Ascension**

Both Plaintiff and Ascension move for summary judgment in their respective favor on Count I: Plaintiff's EMTALA claim against Ascension. Because the parties' cross-motions overlap, the Court addresses the issues raised within their motions together.

*1.    Standing to Bring EMTALA Claim*

First, Ascension raises a threshold issue: whether Plaintiff has standing to bring her EMTALA claim. Ascension asserts Plaintiff does not have standing because EMTALA's private cause of action is generally limited to the patient—not a patient's family member—and Plaintiff does not bring her claim on A.A.'s behalf. Plaintiff disagrees, arguing that she has suffered "personal harm" within the meaning of EMTALA's private cause of action.

EMTALA's private cause of action at § 1395dd(b)(2)(A) provides:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

---

[20] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citation omitted).

[21] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

[22] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

District courts—including this District—have interpreted "[a]ny individual" to be generally limited to the patient themself, not a patient's family members asserting personal claims for emotional distress based upon an EMTALA violation.[23] Most circuits, including the Tenth Circuit, have not squarely interpreted scope of § 1395dd(b)(2)(A)'s standing requirement. In *Moses v. Providence Hospital & Medical Centers, Inc.*,[24] however, the Sixth Circuit interpreted § 1395dd(b)(2)(A)'s standing requirement to extend to a patient's family member.[25] Plaintiff relies on *Moses* to argue she has standing to bring her EMTALA claim in this case.

In *Moses*, the plaintiff brought an EMTALA claim against a hospital as representative of the decedent's estate.[26] The plaintiff alleged the hospital violated EMTALA by releasing the decedent's husband from the hospital without ordering psychiatric treatment for him, after which he murdered the decedent.[27] The Sixth Circuit considered whether plaintiff had standing to bring an EMTALA violation on behalf of the decedent's estate, despite the decedent not being the hospital's patient.[28] The Sixth Circuit held that the plaintiff had standing, reasoning that "the estate of the individual who suffered *an actual personal injury* brings the suit in this case, claiming personal harm as a direct result of the hospital's decision."[29] In addition, the Sixth Circuit reasoned

---

[23] *See*, *e.g.*, *Palmer v. Shawnee Mission Med. Ctr., Inc.*, 2017 WL 5629624, at *6 (D. Kan. Nov. 22, 2017) (collecting cases).

[24] 561 F.3d 573 (6th Cir. 2009).

[25] *Id.* at 579–82.

[26] *Id.* at 575.

[27] *Id.* at 576.

[28] *Id.* at 579–82.

[29] *Id.* at 580 (emphasis added).

that § 1395dd(b)(2)(A)'s plain language "would seem to include [the plaintiff], whose suit alleges that [the decedent]'s death was the direct result of the hospital's decision to release her husband before his psychiatric emergency medical condition had stabilized."[30]

Ascension argues the present case is distinguishable from *Moses* and is more analogous to *Palmer v. Shawnee Mission Medical Center, Inc.*[31] In *Palmer*, three plaintiffs brought an EMTALA claim in their own capacity against a hospital after their family member was discharged from the hospital for false labor and subsequently gave birth at home two hours later.[32] Like Ascension, the hospital in *Palmer* asserted that the plaintiffs as non-patients lacked standing to bring an EMTALA claim.[33] Like Plaintiff, the *Palmer* plaintiffs relied on the Sixth Circuit's ruling in *Moses* to argue that they had standing.[34] And like A.A., the patient in *Palmer* remained living after the hospital visit.[35] Because the plaintiffs brought their EMTALA claim for bystander emotional damages, the district court in *Palmer* distinguished the case from *Moses* and dismissed the plaintiffs' EMTALA claim based on their emotional distress for lack of standing.[36]

Unlike the *Palmer* plaintiffs, however, Plaintiff asserts she does not merely allege bystander emotional damages due to Ascension's treatment of A.A. She alleges her arrest, job loss,

---

[30] *Id.*

[31] 2017 WL 5629624 (D. Kan. Nov. 22, 2017).

[32] *Id.* at *1.

[33] *Id.* at *6.

[34] *Id.* at *7.

[35] *Id.*

[36] *Id.*

and emotional suffering "are direct, concrete personal injuries caused by [Ascension]'s specific acts — a DFS report filed before the MSE was complete and a police call directed by Dr. Cornelius — that flow directly from the EMTALA violation."[37] It is unclear from the caselaw cited in the parties' briefing whether Plaintiff's purported injuries rise to the level of an "actual personal injury" required to gain non-patient standing, such as the decedent's death was in *Moses*.

Assuming without deciding Plaintiff has standing, as explained below, she fails to show she is entitled to summary judgment on the merits of her EMTALA claim in Count I. Instead, the record demonstrates that Ascension is entitled to summary judgment on Count I.

### 2.    *Merits of EMTALA Claim*

Under EMTALA, a hospital that receives Medicare payments and operates an emergency room has two primary obligations to an emergency room patient: (1) screening; and, if necessary, (2) stabilization.[38] Because Plaintiff removed A.A. from Ascension before she could be admitted, only the screening requirement is at issue. To meet the screening requirement, a hospital must "provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists."[39] A hospital violates the screening requirement "when it

---

[37] Doc. 270 at 9.

[38] *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001) (citations omitted); *see also* 42 U.S.C. § 1395dd(a)–(b).

[39] 42 U.S.C. § 1395dd(a).

does not follow its own standard procedures."[40] As such, courts "should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed."[41]

Ascension has an EMTALA policy containing its standard procedures for meeting its screening requirement. Relevant standard procedures from Ascension's EMTALA policy provide:

> 1. Patients who come to a Dedicated Emergency Department requesting examination and treatment will be Triaged and receive a Medical Screening Examination by a QMP.

> 2. The Medical Screening Examination extends until the point that the QMP determines that an Emergency Medical Condition does or does not exist. A patient should continue to be monitored based on the patient's needs, and monitoring should continue until the individual is Stabilized or admitted or appropriately transferred.[42]

Plaintiff's briefing reveals that the crux of her EMTALA claim is based on her allegation that Dr. Cornelius prematurely diagnosed A.A. with THC intoxication and determined she would make a DFS report before official lab results arrived. According to Plaintiff, Ascension's EMTALA policy prohibits these actions. Plaintiff, however, does not offer any evidence that shows Dr. Cornelius's diagnosis and determination constitute a violation of Ascension's standard procedures in its EMTALA policy. She does not identify any portion of Ascension's EMTALA policy that governs DFS reports or any standard procedure that requires a QMP wait for lab results to arrive before rendering a diagnosis.

---

[40] *Phillips*, 244 F.3d at 797.

[41] *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 n.4 (10th Cir. 1994).

[42] Ascension's EMTALA policy defines Qualified Medical Person or Personnel ("QMP") as "physician or non-physician individuals defined by the medical staff's bylaws, rules, and regulations or other document approved by the Hospital's governing body to perform the medical screening examinations for those individuals that present to a Dedicated Emergency Department and request examination and treatment." Plaintiff does not dispute that Dr. Cornelius is a QMP.

-13-

Plaintiff does identify standard procedures that require an MSE be "consistent for every individual" and "extend until the point that the QMP determines that an Emergency Medical Condition does or does not exist." But Plaintiff offers nothing but conclusory allegations to demonstrate that Ascension departed from these standard procedures in screening A.A. Rather, the record demonstrates Ascension adhered to its own standard procedures to meet EMTALA's screening requirement. Dr. Cornelius is a QMP who performed a MSE of A.A. after Plaintiff brought her to the emergency room. As part of A.A.'s MSE, Dr. Cornelius ordered blood and urine lab testing based on Plaintiff's statements to emergency room staff. Dr. Cornelius continued the MSE until she determined an emergency medical condition existed—THC intoxication—and that A.A. should be admitted for continued observation. These actions adhered to Ascension's standard procedures to meet the EMTALA screening requirement.

Plaintiff's briefing also alleges that Ascension violated EMTALA by failing to train Dr. Cornelius on its EMTALA policy, withholding clinical information from Plaintiff, failing to comply with its Against Medical Advice ("AMA") policy, and failing to comply with federal regulations for maintaining medical records. None of these allegations demonstrate that Ascension violated its own standard procedures for screening because none are part of the standard procedures in Ascension's EMTALA policy. Instead, Plaintiff relies on Ascension's Emergency Medicine Services Agreement and Kansas Medical Assistance Program Provider Agreement, which merely require Ascension to follow Medicare regulations on training, patient rights, and record maintenance.[43] A violation of these Medicare regulations do not form a basis for screening

---

[43] *See* 42 U.S.C. §§ 482.11(c); 482.13(a)(1), (b)(1)–(2); 482.24(c)(1)–(2).

requirement violation, and there is no private cause of action available to Plaintiff based upon them.[44] As for the alleged AMA policy violation, all Plaintiff offers is the definition of "Against Medical Advice" in Ascension's EMTALA policy that refers the reader to Ascension's AMA policy for details. Again, Plaintiff offers nothing but conclusory allegations to demonstrate that Ascension violated the AMA policy and that violating it constitutes an EMTALA violation.

What Plaintiff seemingly asserts—viewed in a light most favorable to her—is that Ascension, via Dr. Cornelius, provided a negligent medical screening examination of A.A, which led to Plaintiff's purported injuries. There is an "uneasy intersection between EMTALA and state law medical negligence claims."[45] But "EMTALA does not set a federal standard of care or replace pre-existing state medical negligence laws."[46] As such, EMTALA does not provide a remedy for an inadequate or inaccurate diagnosis, or for injuries flowing thereof.[47] Accordingly, EMTALA does not provide a remedy for Plaintiff, and Ascension is entitled to summary judgment on Plaintiff's EMTALA claim.

**B.    Counts II & III: Plaintiff's State Law Claims**

Because the Court grants summary judgment to Ascension on Plaintiff's EMTALA claim, the Court is authorized to decline supplemental jurisdiction over Plaintiff's KCPA claim against

---

[44] *See Minshew v. Krumme*, 2026 WL 759033, at *2 (D. Kan. Mar. 18, 2026) ("Congress didn't intend for these regulations to create private causes of action. Courts routinely hold that Medicare regulations don't confer such individual rights.") (citations omitted).

[45] *Phillips*, 244 F.3d at 798

[46] *Id.* (citations omitted).

[47] *See id.* at 798–99.

Ascension and Plaintiff's IIED claim against Ascension, Dr. Cornelius, and Sound Physicians.[48] "Whether to exercise supplemental jurisdiction is committed to the court's sound discretion."[49] This is because "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."[50] Specifically, the Tenth Circuit has expressed its preference that, "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[51]

The Court sees no compelling reason not to dismiss Plaintiff's state law claims without prejudice. Accordingly, the Court declines to exercise supplemental jurisdiction overs Counts II and III and dismisses these claims without prejudice.

**IT IS THEREFORE ORDERED** that Ascension's Motion for Summary Judgment (Doc. 108) is **GRANTED as to Count I.**

**IT IS FURTHER ORDERED** that Plaintiff's Partial Motion for Summary Judgment (Doc. 179) is **DENIED**.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over Counts II and III. The Court dismisses Plaintiff's state law claims without prejudice.

**IT IS FURTHER ORDERED** that Dr. Cornelius's and Sound Physician's Motion for Summary Judgment (Doc. 172) **is DENIED as moot**.

---

[48] *See* 28 U.S.C. § 1367(c)(3).

[49] *Satterlee v. Allen Press, Inc.*, 455 F. Supp. 2d 1236, 1257 (D. Kan. 2006).

[50] *Thatcher Enters. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990)).

[51] *Smith v. City of Enid ex rel. City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (citations omitted).

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Expert Testimony (Doc. 170) and Ascension's Motion to Exclude Expert Testimony (Doc. 176) are **DENIED as moot**.

**IT IS SO ORDERED.**

This case is closed.

Dated this 14th day of May, 2026.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

-17-